UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:05CR068 SNL |
| | ) | |
| RONALD FREDERICK GALES, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). A hearing was held on the pretrial motions on March 30, 2005.

**#21 Motion to Suppress Statements**

**#22 Motion to Suppress Evidence**

Based upon the evidence adduced at the hearing on the motions to suppress, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Mark McMurry and Hal Stone are police officers with the Metropolitan St. Louis Police Department. In January, 2005, Officer McMurry, who, at that time, was assigned to the Narcotics Unit, received information from a confidential informant who he had personally not used before as an informant. The confidential informant told him that a person, with whom the confidential informant personally was acquainted, by the name of Ronald Gales was storing large amounts of powder and crack cocaine at 1449 Kingsland Avenue in St. Louis County, Missouri. The confidential informant provided McMurry with Gales' first and last names and described Gales in detail as to his

height, weight, age, and general physical description. The confidential informant also described in detail three vehicles that were operated by and of which Gales had control. These vehicles included a burgundy Cutlass vehicle with a white top and stripes across the length of the car, a green Aurora, and a rental Durango. He described the Cutlas as a top quality restored vehicle. Further, the confidential informant was also aware that Gales did not personally live at 1449 Kingsland, but the house was occupied on a full time basis by the defendant's mother. The confidential informant also told McMurry that he was personally aware that the defendant was involved in the distribution of large amounts of crack and powder cocaine that the confidential informant said was stored at 1449 Kingsland. The confidential informant also said that the defendant manufactured crack cocaine from powder cocaine at this residence.

     As stated, in order to verify the information given by the confidential informant, McMurry and Stone ran a police computer check of the defendant and verified that the confidential informant was correct about the defendant's age and physical description. They also determined from this computer check that the defendant was currently on parole or probation for narcotics convictions. They obtained a photograph of the defendant from the police files, and showed it to the confidential informant who positively identified the defendant as the person who stored and manufactured cocaine at 1449 Kingsland. Because the officers had never used the informant before, they attempted to verify his information as to other matters that they were not investigating. In this regard, the confidential informant provided them with information about a separate investigation and provided information about another person who was involved in drug dealing activity and the type of activity in which this person was involved. In checking with other detectives and police officers in an attempt to verify this unrelated information, Det. Sawyer who is also with the St. Louis police department told

McMurry that the information given by the informant accurately described the drug activities of another subject who Sawyer was currently investigating. Further, McMurry and Stone set up a surveillance of 1449 Kingsland on Monday evening, January 24, 2005, and the following day on January 25, 2005. On January 24, 2005, the confidential informant took the agents to the house and pointed out the house to them as the house in which the defendant stored and manufactured cocaine and cocaine base. On the evening of January 24, 2005, the officers observed the Aurora, which previously had been described by the confidential informant, parked at the house. During their surveillance on January 24, 2005, they had been told by the informant that the defendant was waiting for a person, not known to the informant, who was going to come to the house to purchase a quantity of cocaine. During the surveillance on the evening of January 24, 2005, they observed an individual come to the house operating an SUV. The driver of the vehicle parked in front of the house, went into the house, was in the house for approximately five minutes, and exited the residence returning to the SUV. The officers believed this activity was consistent with drug dealing activity. Further, on January 25, 2005, they also observed three individuals come to the house, stay for a short time, go in, and exit the house. The officers believed, based on their experience, that this activity was consistent with drug dealing.

Based on the above, on January 25, 2005, Det. McMurry applied for a warrant to search the premises at 1449 Kingsland, in St. Louis County, Missouri. He appeared before Judge Gary E. Gaertner, and filed an application and affidavit to search the premises and to seize cocaine, crack cocaine, currency, narcotics paraphernalia, and weapons. The affidavit in support of the search warrant which recited the above information and more detailed information, stated in pertinent part as follows:

3

The affidavit first stated that McMurry had been a police officer about eleven years, and had been involved in narcotics related investigations for more than five years, and received specialized training and experience in investigating narcotics violations. It further stated that McMurry had received information from a confidential informant who advised him that Ronald Gales was presently in possession of quantities of cocaine base and powder cocaine which Gales was currently manufacturing and preparing for distribution and sale. Further, the information provided by the informant stated that the informant personally was aware of Ronald Gales by first and last name, and that Gales was using 1449 Kingsland as a location to secrete a quantity of powder cocaine and cocaine base. Further, the informant told McMurry that Ronald Gales personally converts the cocaine to cocaine base at 1449 Kingsland and packages the cocaine for sale, and that Ronald Gales uses this home both to sell cocaine from the home and obtain cocaine and cocaine base from the home to take to other locations to transfer to customers. Further, the informant stated that these transactions are prearranged by Gales, and that along with cocaine, Gales also secretes firearms and handguns, including one semi-automatic rifle, and cash at the premises. The confidential informant also described Ronald Gales as being a black male, thirty-seven years old, six feet in height, weighing over two hundred pounds, and being of a muscular build. The informant stated that Gales operates several vehicles including a burgundy Cutlass convertible with white racing stripes across the length of the hood; a green Aurora with Missouri temporary tags, and that he currently has possession of a blue Dodge Durango which is rented from a car rental service. The affidavit further states that Rhonda Cole, who is the mother of Ronald Gales, lives at the premises and not Ronald Gales. Further, and significantly, the affidavit states that McMurry is aware of the name of Ronald Gales from previous narcotics investigations and, this awareness is based on information from an informant who is

unrelated to the current confidential source. In addition, the affidavit states that the current confidential informant had proven reliable by providing information which had assisted and corroborated another ongoing narcotics investigation. In this regard, the affidavit recites that McMurry met with Det. Thomas Sawyer of the St. Louis police department and that he provided Sawyer with the information about a separate investigation given to him by the confidential source to determine if Sawyer could verify its accuracy. In this regard, Sawyer told McMurry that the information was accurate, and confirms an ongoing, active investigation which Sawyer is currently investigating involving narcotics involving individuals different from Ronald Gales. In addition, McMurry and Det. Stone conducted a surveillance on the premises known as 1449 Kingsland on the evening of January 24, 2005. On that date, the confidential informant positively identified 1449 Kingsland as the residence at which Gales is currently manufacturing and storing cocaine and cocaine base. Further, the informant on that date positively identified a photograph of the defendant as being the person who was manufacturing and selling cocaine from this residence. In addition, the agents observed at the residence a green Aurora with Missouri temporary tags during their surveillance on January 24, 2005. This is the same vehicle that was described by the informant as being operated by Ronald Gales. Further, the confidential source informed the detectives that Gales was present at the premises at 1449 Kingsland on the evening of January 24, 2005, and was preparing cocaine base for sale. The informant also told them that Gales was waiting for a person who was unknown to the informant to respond to that location to obtain a quantity of cocaine base. During that surveillance, the officers observed a person come to 1449 Kingsland operating an SUV vehicle containing Missouri temporary tags. They observed the driver of the vehicle park in front of 1449 Kingsland, exit the vehicle, and knock on the front door. The individual who answered the front door and allowed this

5

person admittance to the house matched the description of Ronald Gales. This person was in the house for approximately five minutes, exited the premises and returned to the SUV and left the area. The officers concluded that this activity was consistent with narcotics dealing because it was a short visit and corroborated the confidential informant's statement that a person was to be obtaining drugs from the premises. Further, on January 25, 2005, the confidential informant told the officer that a large quantity of cocaine base, cocaine, and firearms were present at 1449 Kingsland. He stated that they were still present there and they had been present the prior evening. Further, on January 25, 2005, Stone and McMurry also conducted surveillances at 1449 Kingsland, and observed three separate people visit the premises and conduct short visits similar to the activity which they observed on January 24, 2005. They believed that this pattern of short visits was consistent with narcotics violations. They also observed at the residence on that date a green Chevy Lumina bearing a Missouri license plate. They checked the license on this vehicle on their police computer, and determined that it was issued to Ronald Gales on a 1996 Chevy Lumina. The affidavit further states that a computer inquiry of Ronald Gales indicated that he had been arrested on numerous occasions for felony narcotics violations, and he was currently on probation for a narcotics conviction.

Based on the above, Judge Gaertner issued a warrant to search 1449 Kingsland, and to seize narcotics, narcotics paraphernalia, weapons, and cash.

Thereafter, on January 25, 2005, the officers went to 1449 Kingsland and set up a surveillance on the house. They did not immediately attempt to effect an entry into the house, but waited at the house until they observed the defendant leave the house. The defendant entered a vehicle and drove down Kingsland away from the house. The officers followed the defendant, and he stopped at a house on Etzel Avenue. As the defendant was exiting the vehicle at the Etzel location, Detectives

Stone and McMurry approached him, told him that they had a search warrant to search the premises at 1449 Kingsland, and that they were detaining him pursuant to executing that search warrant. As Det. Stone approached the vehicle with Det. Applegate, they noticed in plain view on the front seat of the car, through the window of the car, a quantity of marijuana in a plastic bag. Because the defendant was driving and in control of this vehicle and the marijuana was in close proximity to him in plain view, the defendant was, at this point, placed under arrest for possession of marijuana. Det. Stone then immediately advised the defendant of his complete Miranda warnings. He did this by reading the defendant's full Miranda rights to him from a card. After the defendant was advised of his Miranda rights, he was asked if he understood his rights. The defendant stated that he understood his rights. The defendant was not threatened or promised anything in any way to obtain a statement from the defendant at this time or at any later time.

After being advised by Det. McMurry that the officers had a search warrant to search 1449 Kingsland, the defendant stated that he was unaware of that location and had nothing to do with it. After the defendant had been taken to the general location of the house, McMurry told the defendant that he was aware that the house belonged to his mother, and that she was probably not involved in any way in any narcotics dealing. He stated that in order to save his mother some trouble and the detectives some time, he would like the defendant to tell him what was in the house. After a brief period of time, the defendant told McMurry that there was cocaine in the house in a safe in the basement area. When McMurry asked him how much cocaine, the defendant said, "a lot." He further told McMurry whoever gave him the information about cocaine being in the house was, "right on."

Further, Det. Stone searched the defendant after his arrest for possession of marijuana. During this search, Det. Stone retrieved keys from the defendant's pocket. Among the keys retrieved from the defendant was a key which opened the safe which was later found in the house by Det. Stone and contained a kilogram of cocaine.

During the search of the house, Det. Stone and the other officers seized a number of items from the house including a Sentry safe which was located under the basement steps of the house, and this safe in which Det. Stone used the key to gain entry, was found to contain one kilogram of powder cocaine; small baggies of powder cocaine; two other baggies of crack cocaine, and a digital scale. The agents also seized evidence of manufacture of crack cocaine. In this regard, they seized from a microwave oven in the basement of the house a blue bowl which had a white residue in it. Det. Stone knows from his experience that this is an item and tool used to manufacture crack cocaine. Also seized from the basement area of the house was baking soda, also a tool used to manufacture crack cocaine; a trash bag with numerous latex gloves inside of it; plastic baggies used to package the crack cocaine, and eleven wrappers from kilogram quantities of powder cocaine which were found in a trash can. All of the above items were seized pursuant to the execution of the search warrant.

**Conclusions of Law**

A. The Warrant to Search 1449 Kingsland

Based on the above findings, the undersigned concludes that sufficient probable cause existed to authorize the issuance of the above search warrant. In addition, even if the undersigned were to conclude that the affidavit was insufficient to establish the probable cause requirement for the issuance of the warrant, the evidence would nevertheless be admissible because there is ample

8

evidence to support a finding that the good faith exception to the exclusionary rule would apply under United States v. Leon, 468 U.S. 897 (1984).

For a search warrant to be valid, it must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found at the place to be searched. Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967). The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act.

Brinegar v. United States, 338 U.S. 160, 175 (1949).

Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context–not readily or even usefully reduced to a neat set of legal rules." See Illinois v. Gates, 462 U.S. 213, 232 (1983). Further, probable cause in an affidavit "must be weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Illinois v. Gates, at 232. Probable cause may be based on the totality of circumstances present. All that need be shown for probable cause to search is that there is a "fair probability" that contraband or evidence of a crime will be found at the premises to be searched. See Illinois v. Gates, supra. In addition, even an anonymous tip from a crime stopper's hot line or information from an informant in the terms of an anonymous letter is sufficient information upon which to create probable cause as long as there is sufficient factual basis provided by the person, and the statement is otherwise shown to be reliable through corroboration even of innocent details. United States v. Briley, 726 F.2d 1301 (8th Cir. 1984); Illinois v. Gates, supra.

9

In United States v. Ketzeback, 358 F.3d 987 (8th Cir. 2004), the affidavit for a search warrant was based on an untested informant and excluded information from the affidavit that would poorly reflect on the informant's reliability. Further, the corroboration of the informant was largely information that might have been otherwise termed as innocent or innocuous. In addition, another part of the corroboration was that the defendant had been convicted of a drug violation and was on probation for the drug violation. In upholding the validity of the affidavit and the probable cause and corroboration for the affidavit, the court stated as follows:

> Second, the supplemented affidavit would show that the CI had recently witnessed the alleged dealer's sales, that he was able to give a description of the drugs and their packaging, and that he knew Ketzeback had recently encountered police in a cemetery. These are detailed allegations that go beyond 'casual rumor circulating in the underworld,' Spinnelli v. United States, 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed. 637 (1969). Moreover, the deputies corroborated the alleged dealer's name, address, and details of the cemetery encounter. See for example, Tyler, 238 F.3d at 1039; United States v. Buchanan, 167 F.3d 1207, 1211 (8th Cir. 1999) (concluding that omissions, although problematic, did not destroy probable cause partly because the information was validated through independent corroboration of innocent details). It is true, as the district court observed, that this corroborated information was publicly available and established primarily that the CI knew Ketzeback. Nevertheless, independent corroboration of even innocuous facts makes it more likely an informant is telling the truth about incriminating ones, and corroboration of innocent behavior can provide the basis for establishing probable cause.

358 F.3d 987, 991, 992.

In United States v. Reivich, 793 F.2d 957 (8th Cir. 1986), an affidavit with little corroboration was held to be sufficient to support probable cause. The information held sufficient in Reivich was that two individuals of unknown reliability had provided information to the police that the defendant was their source of cocaine, and had given the general location where the defendant lived and provided a phone number for Reivich at that location. Thus, only innocuous details were available to corroborate the information that the defendant was dealing drugs from a house in the general area

10

to which the informants had been followed. In upholding the sufficiency of the warrant and the corroboration, the court stated as follows:

> Second, the information provided by Burns and Linsin was generally corroborated by police investigation. The neighborhood in which Burns and Linsin placed Reivich corresponded to the neighborhood to the police previously had followed Burns and Linsin; the phone number provided by Burns and Linsin was listed to a residence in that same neighborhood; and police the next morning observed a car registered in Reivich's name parked in the driveway of that residence. Furthermore, the affidavit suggested that Burns and Linsin had independently told consistent stories.

United States v. Reivich, 793 F.3d 957, 960, 961.

In United States v. Allen, 297 F.3d 790 (8th Cir. 2002), the informant who had no prior record of reliability told the agents that the informant and the defendant were involved together in the production of methamphetamine, had purchased pseudoephedrine the night before, and the defendant had materials used in the production of methamphetamine stored at his house. He described the defendant's house, told him what cars were parked out in front, and told him the owner of one of the vehicles and said that the defendant was a felon. The only information verified or corroborated of the informant's statement was the address of the home, and the owner of one of the vehicles outside the defendant's premises. In upholding the affidavit and the corroboration as sufficient, the court stated as follows:

> Taken together, we believe the information contained in the search warrant affidavit created a fair probability that law enforcement officers would discover further evidence of illegal drug activity at Allen's residence. The facts that Allen had twenty soda cylinders and thirty lithium batteries in his possession and that they he had spent the night with Craycraft buying ephedrine/pseudoephedrine pills and looking for anhydrous ammonia establish probable cause to believe that Allen had methamphetamine manufacturing equipment and ingredients at his residence...As to Craycraft's credibility, even though he had no record as an informant, the information he provided was sufficiently credible both because the statements were against his penal interest and because the police were able to corroborate some of the information he provided. See United States v. Tyler, 238 F.3d 1036,1039 (8th Cir. 2001) (corroboration of minor innocent details can support probable cause...).

11

United States v. Allen, 297 F.3d 790, 794, 795. See also United States v. Underwood, 364 F.3d 956 (8th Cir. 2004) (agent could assess informant's credibility because information given in person; location of house given confirmed by independent investigation).

As stated above, either an informant or a witness who provides information to police in a face-to-face encounter is deemed more reliable than an anonymous informant. See United States v. Underwood, supra; see also Florida v. J.L., 529 U.S. 266, 276 (2000) (opinion of Kennedy, J.) (if an informant places his anonymity at risk the court can consider this factor in weighing the reliability of the tip). See also United States v. Christmas, 222 F.3d 141 (4th Cir. 2000) (information held sufficient for arrest with statement by neighbor that the officers needed to investigate drugs and guns at 309 Canal because "the guys" had guns on the porch two doors down from her address. The fact that the information was given in person corroborated its reliability).

Based on the above, the undersigned concludes that there was ample probable cause to issue the search warrant. There was, at the very least, the undersigned concludes, a "fair probability" that the search of the premises would disclose evidence of drug dealing. In the case now at bar, the informant's information is detailed, firsthand, and corroborated in several respects. As in Reivich, supra, the informant was accurately able to give details of automobiles which were parked at the residence which he said the defendant drove, and at least one of the automobiles upon checking the license plate was found to be that of the defendant. Further, as in United States v. Christmas, supra, Florida v. J.L. supra, and United States v. Underwood, supra, the informant gave the information in person. Further, independent investigation revealed that the defendant had numerous arrests for felony drug violations and was currently on probation or parole for drug violations. As stated in Ketzeback, supra:

> The very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law...this observation is particularly salient here where the CI's allegations of illicit conduct were similar to the conduct for which Ketzeback received probation.

358 F.3d 987, 991, 992. Exactly the same situation exists in the case now at bar. In addition, the informant gave a full description of the defendant which was corroborated independently and identified a picture of the defendant and pointed out the house from which the defendant was dealing drugs. This corroboration is similar to the information held sufficient in <u>Ketzeback</u>, <u>supra</u>; <u>Reivich</u>, <u>supra</u>; and <u>Allen</u>, <u>supra</u>. Further, as stated, the information was independently corroborated by another detective by checking out information which the CI had given to McMurry about a separate investigation. Contrary to the apparent allegations of the defendant, this information is detailed and particularized in the paragraph 2 of the affidavit. There is no misstatement in the affidavit as to the reliability of the informant because the affidavit states exactly what information was given by the informant and how it was corroborated. In addition, it is clear that the information about the separate investigation in the affidavit was about "an ongoing narcotics investigation." (Affidavit paragraph 2.) Thus, the evidence shows that there were no misstatements by the officers about the reliability of the informant, and the separate information, in fact, is about an ongoing narcotics investigation and further corroborates the informant.

Based on the above, the undersigned concludes there is ample and sufficient probable cause for the issuance of the warrant to search the premises. Therefore, the undersigned concludes that the search of the premises was lawful.

<u>B. The Detention of the Defendant for the Execution of the Search Warrant and the Arrest of the Defendant for Possession of Marijuana</u>

Based on the above findings, the undersigned concludes that the arrest of the defendant and the seizure of the marijuana from the front seat of the vehicle were lawful.

Police officers may arrest persons without a warrant if they have probable cause to believe that the person arrested has committed a crime. Gerstein v. Pugh, 420 U.S. 103 (1975); Beck v. Ohio, 379 U.S. 89 (1964). Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context–not readily or even usefully reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). In the context of a warrantless arrest, all that need be shown is a "fair probability" that a crime has been committed and that the defendant has committed the crime. See Illinois v. Gates, supra.

In United States v. Sherrill, 27 F.3d 344 (8th Cir. 1994), the court held that an affidavit for a search warrant to search the defendant's home could provide probable cause to arrest the defendant even prior to the search. In Sherrill, supra, officers applied for and obtained a warrant to search the defendant's house. The facts relied on by the officers to support the warrant include an informant personally observing the defendant selling cocaine in his house shortly before the warrant was issued, and observations of police officers showing pedestrian traffic consistent with drug sales. Before executing the warrant, the police arrested the defendant at a location approximately one block from the search while the defendant was driving his vehicle, and took the defendant to the house while the search was conducted. In holding this arrest to be lawful, the court stated as follows:

> Sherrill argues that because the police had not conducted the search, the police had no probable cause to arrest him. Thus, Sherrill contends that he was illegally arrested in violation of the Fourth Amendment, and the evidence later found when he was searched incident to the arrest should have been suppressed. We disagree...Although the police officers may not have believed that they had probable cause to arrest Sherrill, and indeed, did not apply for an arrest warrant when they applied for a search warrant, we believe the objective facts in the case reveal that probable cause existed...In this case, when officers stopped Sherrill the police knew from a

> confidential informant that Sherrill had been dealing crack from his home and had sold crack within the past twelve hours...The police also substantially corroborated the informant's tip by independent investigation. The police observed unusual pedestrian traffic consistent with drug sales both at Sherrill's residence and a dwelling that Sherrill often visited. Based on the totality of the circumstances, we conclude that probable cause existed to arrest Sherrill at the time the officers stopped him in his car.

27 F.3d 344, 346, 347.

The undersigned submits exactly the same situation exists in the case now at bar as was present in Sherrill, supra. In the present case, the officers possessed detailed information from an informant that Ronald Gales was packaging, storing, and distributing cocaine from 1449 Kingsland Avenue, and that he had done so the previous evening, and that large amounts of cocaine still were present on the defendant's premises. This information came from an informant who had firsthand information from his own observations of the defendant in possession of and distributing this cocaine. In addition, the officers had corroborated in substantial detail the information of the informant, including the cars that the defendant was driving, the detailed and accurate description of the defendant's physical characteristics, the informant's identification of the defendant's picture, the fact that the defendant was on probation or parole for exactly the same type of offense, the fact that the informant had been independently corroborated by information which he gave to the detectives about a separate investigation, and, finally, the observation of the officers of the defendant involved in activity consistent with drug dealing. Thus, the undersigned concludes that, based on the above, there was, at the very least, reasonable suspicion provided in sufficient detail to allow the detectives to detain the defendant for the pendency of the search warrant, and the undersigned further concludes that there was ample probable cause to arrest the defendant for drug dealing at the time they observed him getting out of his car on the street.

The undersigned also concludes that the officers had probable cause to arrest the defendant at the time they observed the marijuana in plain view in his car in close proximity to where he had been sitting while driving the car. The officers observed the marijuana through the window of the vehicle as they approached the defendant to inform him that they had a warrant to search the house. The undersigned concludes that the defendant had no reasonable expectation of privacy as to the marijuana which the officers could see from outside the vehicle. See United States v. Elwood, 993 F.2d 1146 (5th Cir. 1993). Therefore, the arrest of the defendant for possession of marijuana was lawful since the officers observed the defendant driving a vehicle which contained the marijuana in plain view on his front seat. In addition, according to the search warrant, the vehicle was registered to the defendant. Therefore, there was ample probable cause to arrest the defendant for the separate charge of possession of marijuana.

Further, when police officers place an occupant of a vehicle under lawful, custodial arrest, they may search that person as well as the passenger compartment of the vehicle without further probable cause. See New York v. Belton, 453 U.S. 454 (1981). Therefore, the undersigned concludes that the search of the defendant, and the seizure of keys and other items from the defendant's person was lawful as was the seizure of the marijuana in plain view on the front seat of the vehicle.

C. The Execution of the Search Warrant at 1449 Kingsland

Further, the undersigned concludes that the house was searched and entered in a lawful manner after the defendant was fully informed that a warrant existed to search the house and that the officers would search the house. Thus, the "knock and announce" provisions of a search warrant were met. Further, the undersigned concludes that all of the items seized during the execution of the

16

warrant were lawfully obtained. The items were either detailed in the warrant or the items were clearly evidence of drug trafficking crimes. See Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971). Therefore, the undersigned concludes that the items seized from the residence should not be suppressed.

### D. Statements Made by the Defendant After His Arrest

The undersigned concludes that the custodial statements made by the defendant were voluntarily made after the defendant was fully advised of his rights, stated he understood those rights, and tacitly waived his rights by speaking to police officers. The evidence shows that the defendant was fully advised of his Miranda rights immediately after his arrest, and stated he understood his rights. Although the defendant may have been handcuffed during some of the interview, there was no evidence the defendant was threatened or coerced in any way, nor was he promised anything in return for any statements which he made. Given the above facts, the undersigned concludes that the defendant was fully advised of his rights, stated he understood his rights, and knowingly waived his rights by agreeing to talk to the detectives. The undersigned further concludes that, based on the totality of the circumstances, the defendant's questioning and the defendant's statements were voluntarily made and his free will was not overborne by anything which took place during the interview. Miranda v. Arizona, 384 U.S. 436, 467-75 (1966); North Carolina v. Butler, 441 U.S. 369, 374-75 (1979); Colorado v. Connelly, 479 U.S. 157 (1986); Moran v. Burbine, 475 U.S. 412 (1986); United States v. House, 939 F.2d 659 (8th Cir. 1992) (defendant's waiver may be inferred from the fact that the defendant responded to questions after being advised of and understanding his rights). Therefore, the defendant's statements should not be suppressed.

**Conclusion**

Therefore, the defendant's motion to suppress statements and motion to suppress evidence should be denied.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that (Doc. #21) Motion to Suppress Statements and (Doc. #22) Motion to Suppress Evidence should be **denied**.

Further, as to the motions to suppress, the parties are advised that they have eleven (11) days in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990)

                                          /s/ Terry I. Adelman
                                UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of June, 2005.